906.   CITIZENS BANK OF FITZGERALD *v.* RUDISILL.

1. Even the first grant of a new trial will be reversed, if the pleadings and the proof affirmatively disclose that the verdict rendered represents the only result legally possible in the case.
2. An action for money had and received lies, in case the defendant has taken to his use money which ex æquo et bono belongs to the plaintiff. It needs for its support no actual contractual relation, for the law will imply a quasi-contractual relation to uphold it, whenever the circumstances so require.
3. Where the action proceeds upon the theory that the plaintiff has paid the defendant money under a mistake of fact, it must appear that such a mistake did really exist, that the plaintiff at the time of the payment did not know, or at least that he did not recollect that he did not owe the money; otherwise the payment will be held to be not recoverable.
4. In such cases the plaintiff must show that he was laboring under a mistake as to the facts, and not merely that he was ignorant of the means of proving the facts which would show his non-liability.
5. Although the plaintiff has paid the defendant money under a mutual mistake, yet if, acting on the payment, the defendant has so changed his situation that the mistake can not be rectified without entailing on him a loss of the sum paid, the action will not lie.
6. In the present case the petition and the proof show that the payment by the plaintiff to the defendant was voluntary, and not by mistake; and the proof further discloses that, acting upon faith of the payment, the defendant had yielded to a third person property equal in value to the sum claimed; therefore a verdict for the defendant was demanded, and the court erred in granting the plaintiff a new trial.

Certiorari, from Ben Hill superior court—Judge Whipple. November 22, 1907.

Submitted February 17,—Decided March 16, 1908.

*O. H. Elkins,* for plaintiff in error.

*C. W. Fulwood, E. W. Ryman,* contra.

POWELL, J.    A presentation of the case, which omits a number of details of facts but which outlines them fully enough to illustrate fairly the position of both parties, may be stated as follows: At the organization of the Citizens Bank of Fitzgerald, Rudisill, the plaintiff, a young man of good standing in the community but of no experience in the keeping of bank books, was elected cashier, and, as is customary in small banks, the duty of keeping the books devolved upon him.    A great many irregularities in the manner of keeping the books, papers, accounts, etc., of the bank thus arose. The present suit had its origin in a transaction had with one Handley, who subscribed for certain shares of capital stock.    According to Rudisill's contention, Handley had given his note for $300 for three of the shares of stock for which he had subscribed. On November 2, 1905, Handley took up this note by paying $100 cash and transferring to the bank a note of Hammock Lumber Company for $200.    Of course upon the cash book this transaction should have been entered as follows:    On the debit side cash should have been charged with $300; and on the other side should have been credited with the discount of the Hammock Lumber Company note, $200, leaving $100 difference to be accounted for in the item of "cash on hand at the close of this day's business."    These entries on the cash book, under the double-entry system by which bank books are generally kept, should then each have found its corresponding entry on the general ledger.    Instead of doing this the cashier made, on the credit side of the cash book, two entries: "loans and discounts, R. V. Handley $300;" "Hammock Lumber Co. $200;" carrying forward the total credit of $500; and to offset this he debited the cash account with the following entry:    "Capital stock, R. V. Handley, $500."    The record does not disclose what corresponding entries were made upon the general ledger, nor exactly how this factitious balance led to the result which finally came about, namely, that a little later Rudisill was charged with being $200 short.    It is disclosed, however, that it resulted in

a certificate for 15 shares of the capital stock of the bank being issued in Handley's favor, as representing the sum total of all his payments on capital stock, when, as claimed by Rudisill, he had paid for only 13 shares. Handley insisted then, and testified on the trial, that he had paid for all 15 of these shares; though he was unable to give the details of the payment, with anything like satisfactory accuracy. However, under those admissions which, for the sake of argument, it is necessary that the plaintiff in error should make in order that he may bring under review the first grant of a new trial, the case here must be considered in the light most favorable to Rudisill; and, for this purpose, we take it that the transaction occurred just as Rudisill contends. Being confronted with this apparent shortage, Rudisill denied liability, and stated to the directors of the bank that the apparent shortage came about by reason of the fact that from some cause Handley was credited with $200 more capital stock than he ought to have been credited with. He was unable to show definitely where his error lay, and the directors informed him that he must either pay the $200 or that the matter would be referred to the bonding company, which had stood surety for the faithful performance of his duties as cashier. In the meantime the issuance of the stock to Handley had been held up; but upon the threats of the directors to report the matter to the bonding company, Rudisill, protesting that he did not owe the $200, and, as he himself admits, with full knowledge that he did not owe it, paid it; and the bank thereupon issued to Handley the certificate for 15 shares of stock. Afterwards the bank's books were checked up by an expert accountant, and upon his report showing, as Rudisill claimed, that the shortage originally alleged did not exist, he sued for the recovery back of the $200. The trial court directed a verdict for the defendant, and the case was taken by certiorari to the superior court, where the judgment of the lower court was reversed and a new trial ordered. To this ruling in the superior court, the bank brings error, asserting, that under the pleadings and the evidence the verdict was demanded; that the petition itself did not set out a cause of action; that the proof did not support the petition or show any other cause of action. The petition distinctly asserted that the plaintiff knew, at the time he made the payment, that it was an error, and that he was not indebted to the bank in any amount.

1. To uphold the first grant of a new trial, whether by the trial judge on motion for that purpose, or by the judge of the superior court on certiorari, every presumption will be indulged, in the light of that broad discretion which exists in such cases. Where there is any conflict in the evidence, the first grant of a new trial will not be disturbed, though the apparent preponderance lies with the plaintiff. There are cases where it will not be disturbed though the evidence demands the verdict rendered; for instance, where there have been erroneous rulings upon the pleadings or the evidence which might have prevented the losing party from getting his full case before the jury. Even though the petition should not set out a cause of action, and though there has been a verdict for the defendant, the first grant of a new trial will not necessarily be reversed; for it may be upheld on the theory that the judge took into consideration that the petition, upon another trial, might be amended. But where the petition and the plaintiff's proof both clearly and unmistakably show that his full case has been presented, and that beyond doubt he has no right to recover, and there has been a verdict for the defendant, the trial judge, as a matter of law, errs in granting a new trial. We are constrained to hold that such is the case in the present instance.

2. The plaintiff's suit is in essence an action for money had and received; an action, be it said, which, when properly supported, is in no disfavor with courts either of law or of equity. At common law it was given great scope of usefulness, and especially was much encouraged by Lord Mansfield, who recognized the equitable nature of the remedy, and extended it to all cases where a refusal of the remedy would result in an unjust enrichment of the defendant. In Moses v. Macferlan, 2 Burrows, 1008, he says: "If the defendant be under an obligation, from the ties of natural justice, to refund, the law implies a debt, and gives the action, founded in the equity of the plaintiff's case, as it were upon a contract ('quasi ex contractu') as the Roman law expresses it. . . This kind of equitable action to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, ex æquo et bono, the defendant ought to refund. . . In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money."

And in such an action "it is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." 27 Cyc. 864 (K). Indebitatus assumpsit will therefore lie to recover the overplus of a double payment (27 Cyc. 862 (F)), or money which has been paid under a mutual mistake of fact. 27 Cyc. 873 (iv) ; Keener on Quasi Contracts, 26.

3. To authorize a recovery, however, on the theory that the plaintiff has paid the defendant money under a mutual mistake of fact, it must appear that there was an actual mistake as to the facts ; for the law will not allow a man who has paid money, know‐ ing that the payee is not entitled to receive it, to recover it. "Since the payment was unnecessary, plaintiff must be regarded as having intended to make a gift of that sum of money to the defendant,— in which event there is no reason why he should be allowed to re‐ cover it,—or else as attempting to shift his position from that of a defendant to that of a plaintiff,—a course which would in most cases be unfair to the claimant, and which is not allowed in any case where the law deems the payment a voluntary one." Keener on Quasi Contracts, 27. The word "knowledge," when applied in this connection, is not, however, used in the broad sense in which it is sometimes used. A man may have a fact in memory, but at a given moment his faculty of recollection may not present it to him. For example, you pay a debt, and, being a conscious agent, you of course possess the cognition of the fact; your memory stores it away; later your creditor presents his demand again. Though, in the broad sense, knowing that you have paid it, and though, still holding that fact dormant in your memory, yet not recalling it,—that is, forgetting it,—you pay it again. In such cases, for the purposes of the principles we are discussing, you are not considered as having knowledge of the fact.

4. Another limitation on the right to recover money in such cases is that the plaintiff must have been mistaken as to the facts, and not merely ignorant of the means of proving the facts which would show his non-liability. "Ignorance of a fact is one thing, ignorance of the means of proving a fact is another. When money voluntarily paid is recovered back, it is because there was some mistake as to the fact. But here the plaintiff was not mistaken

as to the fact. Only at the time he did not know how to prove it. The subsequent discovery of evidence to prove a fact known to the party when he made the payment can not authorize a recovery back of the money. Such a principle would be most dangerous." Windbiel *v.* Carroll, 16 Hun (N. Y.), 101, 103.

5. So also, in no event can the plaintiff recover if the defendant has so changed his position that he can not be put in statu quo. "To say that a plaintiff can recover money paid by mistake, notwithstanding the recovery will throw a loss upon the defendant, provided the plaintiff is under no obligation to the defendant, is to lose sight of the grounds upon which a recovery is allowed,— namely, that the defendant has money which in conscience he can not keep. . . The principle that forbids the defendant enriching himself at the expense of the plaintiff should clearly forbid the plaintiff indemnifying himself against loss at the expense of an innocent and blameless defendant." Keener on Quasi Contracts, 67, 73. Therefore, where by mistake money has been paid to an agent, and the agent has in good faith turned it over to his principal, the third party can not proceed against the agent; and vice versa, where a principal has received money from his agent under a mistake of fact, and the principal has in good faith paid it over to the third party as a result of the mistake of the agent, and before the discovery thereof, the agent can not recover it from his principal. See Keener on Quasi Contracts, 63.

6. Specifically applying these principles, it is to be seen that Rudisill paid this money to the bank, not in ignorance or forgetfulness of the fact that he did not owe it, but merely because he did not have at that time at his command the means of proving that he did not owe the money, and because he voluntarily chose to pay money which he knew and recollected he did not owe, rather than have the transaction presented to his sureties. He yielded and waived further contention as to his liability for the money, and paid it over; the bank in turn gave due effect to the payment as a basis for settling the dispute existing between it and Handley, the stockholder. It may be justly said, under these circumstances, that the bank did not take or receive money to its benefit, so much as to the benefit of Handley. It does not now retain the money without having given a quid pro quo; for, upon the faith of this money, it has surrendered to Handley $200 worth of its capital

stock. The controversy is therefore shifted, and if Rudisill has a cause of action against any one it is against Handley; for he, if any one, has ultimately received that which ex æquo et bono belongs to the plaintiff. See 27 Cyc. 864. (K); Moses *v.* Macferlan, supra; *Bates-Farley Savings Bank* v. *Dismukes,* 107 *Ga.* 212 (33 S. E. 175). The plaintiff's pleading and his proof both affirmatively disclose that he has no cause of action against the present defendant; the verdict rendered represents the only result legally possible in the case; and the judgment setting it aside and granting a new trial will therefore be reversed.          *Judgment reversed.*