**Raymond Lione MORTER, aka d/b/a Swinengineering, Inc., Debtor–Appellant,**

v.

**FARM CREDIT SERVICES, Defendant–Appellee.**

No. 90–1534.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1990.

Decided July 16, 1991.

Chet Zawalich, Boynton, Kamm & Esmont, South Bend, Ind., for Farm Credit Services.

Carolyn S. Holder, Holder & Davis, Lafayette, Ind., Elizabeth A. Justice, Wernle, Ristine & Ayers, Crawfordsville, Ind., for Raymond L. Morter.

Leonard Opperman, George T. Patton, Jr., Bose, McKinney & Evans, Indianapolis, Ind., for amius curiae Teachers Ins. and Annuity Ass'n of America and College Retirement Equities Fund.

Before BAUER, Chief Judge, and FLAUM and KANNE, Circuit Judges.

BAUER, Chief Judge.

Raymond Lione Morter served as a professor of veterinary science at Purdue University for more than thirty years. He was forced to retire at age seventy in the fall of 1990 because of Purdue's mandatory retirement policy. As a condition of his employment at Purdue, Morter was required to participate in Purdue University's retirement plan, the Teacher's Insurance and Annuity Association of America/College Retirement and Equity Fund ("TIAA–CREF"). Although a participant may make voluntary payments to the plan, Morter chose not to do so; Purdue paid all preretirement contributions on his behalf.

The retirement plan in question—TIAA–CREF—provides funding for the retirement programs of over half a million employees in over 3000 colleges and universities. *See generally Peters v. Wayne State University,* 476 F.Supp. 1343, 1346 (E.D. Mich.1979), *rev'd,* 691 F.2d 235 (6th Cir. 1982). The TIAA component of the plan is a nonprofit, legal reserve life insurance policy that promises to pay a fixed annuity for life based on a contractually guaranteed rate of return, plus dividends, when a beneficiary reaches retirement age. When a participant retires, TIAA applies preretirement contributions to purchase a fixed annuity contract for the participant's benefit. TIAA places the preretirement accumulations in the payout annuity pool. The plan then evaluates the participant's life expectancy and calculates benefits for him. The plan adjusts the benefits of all other participants in the annuity pool based on that expectancy. If the participant dies before the time projected, the other participants in the pool will have more funds available to them. If the participant outlives TIAA's projection, the contributions of the other participants to the annuity pool will be used to continue the contractually guaranteed benefits and dividends as declared. Annuity income begins not later than April 1 of the calendar year following the year in which an annuitant attains the age of 70½ years.

CREF is a companion nonprofit corporation created to invest in financial instruments other than those traditionally permitted for fixed annuity funds like TIAA. Unlike TIAA, CREF provides an annuity that varies with the success of its investments.

The strict anti-assignment provision of TIAA–CREF makes it impossible for annuitants to reach the funds in their accounts before retirement. *See Connick v. Teachers Insurance and Annuity,* 784 F.2d 1018, 1021 (9th Cir.) (annuitant may not reach assets of TIAA–CREF plan until retirement, and then only as set forth in the plan), *cert. denied,* 479 U.S. 822, 107 S.Ct. 91, 93 L.Ed.2d 43 (1986). The TIAA and CREF contracts state that the plan makes "no provision for cash surrender or loans and cannot be assigned." The TIAA contract specifically provides:

16. *No assignment.* Any assignment or pledge of this contract or of any benefit hereunder will be void and of no effect.

17. *Protection Against Claims of Creditors.* The benefits, options, rights, and privileges accruing to any Beneficiary will not be transferable or subject to surrender, commutation, or anticipation, except as may be otherwise endorsed on this contract. To the extent permitted by law, annuity and other benefit payments will not be subject to claims of any creditor of any Beneficiary or to execution or to legal process.

Clause 17 of the CREF contract contains similar language protecting benefits against the claims of creditors. Pursuant to these provisions, Morter had no access to the accumulation of assets in the TIAA–CREF retirement plan short of retirement or death.

In June 1986, Morter filed a voluntary petition for bankruptcy pursuant to Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1978). A bankruptcy estate consists of "all legal and equitable interests of the debtor in property as of the commencement date." 11 U.S.C. § 541(a)(1). Sections 522 and 541 of the Code permit a debtor to retain certain assets. In particular, section 541(c)(2) provides, "A restriction on the transfer of a

beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Thus, if state law prevents a creditor from reaching certain income payable at a future date, then the Bankruptcy Code similarly will treat that income as outside the bankruptcy estate and unreachable by creditors.

On his schedule listing property exempt from the bankruptcy estate, Morter listed his interest in the TIAA–CREF retirement plan at $280,795.86. Both the Farm Services Credit of Madison, Wisconsin (d/b/a Product Credit Association and d/b/a The Federal Bank Association) and the United States Trustee objected to the claimed exclusion of the TIAA–CREF retirement plan, so the matter was submitted to the bankruptcy court for decision. On July 6, 1989, the court issued a Memorandum and Order sustaining the objections to Morter's claimed exemptions. The court ruled that the retirement plan was the property of the bankruptcy estate and that the only exemption Morter could take was a $100 intangible personal property right allowed by Indiana law. *See* Ind.Code § 34–2–28–1(a)(3) (1980). On February 6, 1990, the district court issued a Memorandum Opinion and Order that vacated in part and affirmed in part the judgment of the bankruptcy court. From that judgment, Morter brought a timely appeal.

■ State law determines whether access to a fund is sufficiently restricted to qualify for exclusion from the bankruptcy estate. The TIAA and CREF contracts expressly state that New York law governs their interpretation. Applying New York law, the district court concluded that the CREF component of the retirement plan was excluded from the bankruptcy estate, but that the TIAA component was not. *See Morter aka d/b/a Swinengineering, Inc. v. Farm Credit Services*, 110 B.R. 390, 393 (N.D.Ind.1990). The basis for the dissimilar treatment was TIAA's provision of a fixed annuity that carried the possibility that the plan administrators might have to invade the corpus to pay the promised benefits if the fund suffered a shortfall in any given year. The district court characterized this benefit scheme as an annuity, not a trust. In contrast, CREF does not guarantee annuitants a fixed dollar amount but, rather, a variable share.

In order to decide whether the TIAA–CREF was excluded from Morter's bankruptcy estate under section 541(c)(2) of the Bankruptcy Code, the district court examined in some detail the legislative history of the provision. The court determined that Congress intended to exclude from bankruptcy estates only "traditional"—i.e., donative—spendthrift trusts under applicable nonbankruptcy law. *See Morter*, 110 B.R. at 395. *See also* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 369, *reprinted in* 1978 U.S.Code & Admin.News 5963, 6325; S.Rep. No. 95–989, 95th Cong., 2d Sess. 83, *reprinted in* 1978 U.S.Code & Admin.News 5787, 5869. Characterizing a retirement plan as a spendthrift trust is simply another way of stating the conclusion that it must be excluded from the bankruptcy estate. A spendthrift trust is one "created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his improvidence or incapacity." *Black's Law Dictionary* 1400 (6th ed. 1990). The classic example of such an arrangement is the trust a parent might set up for an irresponsible child who might fritter away the funds before reaching majority. Of critical importance, then, is whether a fund has access restrictions similar to those of a spendthrift trust, which "place the fund beyond the reach of the beneficiary's creditors, as well as ... secure the fund against the beneficiary's own improvidence." *Matter of Goff*, 706 F.2d 574, 580 (5th Cir.1983).

Morter believes that the district court over-emphasized the importance of the fact that TIAA someday might have to reach into its own funds. In this appeal, both he and *amicus curiae* TIAA–CREF argue that, in reviewing pension plans to determine whether they are included or excluded from the bankruptcy estate, courts properly should focus on whether the *debtor* has access to the funds. If, as here, the debtor's access is restricted by a ban on receiving any of the funds until retirement, a

prohibition against lump sum distributions, and restrictions on alienation, the pension should be excluded from the bankruptcy estate.

■ Courts are split on the standards for determining whether a given set of restrictions on transfer and debtor access are sufficient to warrant the exclusion of a retirement or pension plan from a bankruptcy estate under 11 U.S.C. § 541(c)(2). Some have held that the plan must constitute a traditional spendthrift trust under applicable state law. *See, e.g., In re Swanson*, 873 F.2d 1121, 1123 (8th Cir.1989); *In re Lichstrahl*, 750 F.2d 1488, 1490 (11th Cir.1985); *Goff*, 706 F.2d at 587. *Cf. In re Nadler*, 122 B.R. 162, 166 (Bankr.D.Mass. 1990) (section 541(c)(2) applies only "to the type of trust that traditionally has contained restrictions on assignments and not to trusts involving employee benefits"). Other courts have held that the plan need only exhibit the characteristics of a spendthrift trust under state law to be excluded. *See, e.g., McLean v. Central States, Southeast and Southwest Areas Pension Fund*, 762 F.2d 1204, 1207 n. 1 (4th Cir.1985) ("Nowhere in [§ 541(c)(2)] is there a requirement that the trust be 'traditional,' nor is there any definition of what might be found to constitute a 'traditional' trust."); *In re Atallah*, 95 B.R. 910, 919 (Bankr.E.D. Pa.1989) ("Section 541(c)(2) is not limited to traditional spendthrift trusts, but also applies to pension funds which exhibit the characteristics of a spendthrift trust."); *In re Watkins*, 95 B.R. 483, 488 (W.D.Mich. 1988) (pension plan is enforceable under Michigan law as a spendthrift trust because it prohibits alienation of interest); *In re Hysick*, 90 B.R. 770, 775 (Bankr.E.D.Pa. 1988) (court must look at "a variety of factors"); *In re Pettit*, 61 B.R. 341, 346 (Bankr.W.D.Wash.1986) ("The degree of control that the debtor may exercise over the trust assets is a crucial factor in determining the issue of inclusion in, or exclusion from, the bankruptcy estate."); *In re Threewitt*, 24 B.R. 927, 929 (D.Kan.1982) ("relevant question is not whether the Plan looks like a good, old fashioned spendthrift trust"). *See also In re Vogel*, 78 B.R. 192, 195 (Bankr.N.D.Ill.1987); *In re Guernsey*,

54 B.R. 68, 69 (Bankr.S.D.Fla.1985); *In re Kwaak*, 42 B.R. 599, 602 (Bankr.D.Me. 1984); *In re Phillips*, 34 B.R. 543, 546 (Bankr.S.D.Ohio 1983).

The collective wisdom of this second group of cases is persuasive: the plain language of section 541(c)(2) does not require that a retirement plan be a "traditional" spendthrift trust. We agree with the Fourth Circuit's reasoning in *McLean* that section 541(c)(2)

> should [not] be confined in its recognition of enforceable transfer restrictions to those found in "traditional" spendthrift trusts. The language of § 541(c)(2) does not suggest such a limitation, and the legislative history reveals only that the provision has the unambiguous purpose of preserving enforceable transfer restrictions in spendthrift trusts....

762 F.2d at 1207 n. 1. Even in cases in which courts have included retirement plans within the bankruptcy estate, there has been a willingness to exclude the plan if it is employer-created and controlled and, therefore, analogous to a spendthrift trust. *See, e.g., Swanson*, 873 F.2d at 1124 (court indicated that the law creating a teacher retirement fund included language similar to that found in spendthrift trusts, but because the debtor-teacher contributed to the fund, the retirement plan was self-settled and would not qualify as a spendthrift trust under Minnesota law); *Goff*, 706 F.2d at 589 (employer-created and controlled retirement plans may be characterized as "spendthrift trusts" for purposes of 11 U.S.C. § 541(c)(2) even though they are not traditional spendthrift trusts).

Moreover, in every decision we could find that addressed the very pointed question whether TIAA is a spendthrift trust under New York law, the answer was a resounding "yes." *See, e.g., In re Reynolds*, No. 87–1515311F, slip op. (Bankr.W.D.Ark., September 18, 1989); *In re Montgomery*, 104 B.R. 112 (Bankr.N.D.Iowa 1989); *In re Woodward*, No. 3–86–03344(3), A.P. No. 3–87–0036, slip op. (Bankr.W.D.Ky., February 16, 1988), *aff'd*, No. 3–86–03344(3)7 Civil Action C88–0161–L(A), slip op. (W.D.Ky., June 24, 1988); *In re Braden*, 69 B.R. 93

(Bankr.E.D.Mich.1987). In addition, two New York state courts have held that the TIAA–CREF plan has all the characteristics of a spendthrift trust necessary to allow the plan to be excluded under section 541(c)(2). *See Matter of Aurora G. v. Harold. Aaron G.*, 98 Misc.2d 695, 414 N.Y. S.2d 632 (1979); *Alexandre v. Chase Manhattan Bank*, 61 A.D.2d 537, 403 N.Y.S.2d 21 (1978).

The proper inquiry under section 541(c)(2), then, is not whether the accumulated funds are in a "traditional" spendthrift trust, but whether the retirement plan bars the beneficiary and his creditors from reaching the funds. If it does, the plan is tantamount to a spendthrift trust under state law. When we look at a retirement plan to determine whether it is a spendthrift trust, the fact that the plan administrators might have to dip into the fund to make up any shortfall is not as important to the analysis as the extent of access to the plan and who has that access.

■ What about Morter's retirement plan? It is not "self-settled," *see Swanson*, 873 F.2d at 1124, because participation in the plan is a condition of employment and Purdue University contributed the entire amount of Morter's TIAA contract. In establishing the plan and in contributing the entire cost of Morter's participation, Purdue University intended to provide for the maintenance and support of Morter and his dependents during his retirement, while at the same time protecting him against his own improvidence with regard to the use of the plan funds prior to that time. Consequently, the plan was set up so that Morter would not have any control over the accumulation of its assets until retirement, and then only as set forth in the plan.

The plan provides that, upon retirement, Morter will receive monthly payments from his TIAA plan; he will not receive a lump-sum distribution of the assets. Although Morter can opt to receive a ten percent distribution on retirement, he does not have access to the other ninety percent that will generate income to be paid out over time. The fact that ninety percent of the fund is distributed in the form of periodic payments demonstrates that the fund was structured to insure the preservation of the corpus. To our mind, this scheme bears all the earmarks of a spendthrift trust. *Cf. Watkins*, 95 B.R. at 488 (plan was employer-created and controlled; plan established a pension fund, a plan trustee, and designated named fiduciaries; plan contained provisions for acts of trust administration; plan provided for distribution of monthly benefits with no provisions for lump sum distributions).

Further, the TIAA plan would be enforceable as a spendthrift trust under state law because, in New York, all express trusts are presumed to be spendthrift unless the settlor expressly provides otherwise:

> The right of a beneficiary of an express trust to receive the income from property and apply it to the use of or pay it to any person may not be transferred by assignment or otherwise unless a power to transfer such right, or any part thereof is conferred upon such beneficiary by the instrument creating or declaring the trust.

N.Y. Est. Powers & Trust Law § 7–1.5(a)(1) (McKinney 1988). *See In re Kriess*, 72 B.R. 933, 942 (Bankr.E.D.N.Y. 1987) ("N.Y. Est. Powers and Trust Law section 7–1.5(a)(1) effectively renders all trusts in New York mandatory spendthrift trusts unless designated otherwise in the trust instrument."). Not only that, pension plans that bar a beneficiary's access "create a situation analogous to a spendthrift trust ... [that] must be enforced according to their spirit." *In re Guardianship of Dugan*, 29 Misc.2d 980, 982, 222 N.Y.S.2d 831, 833 (1961). Moreover, as noted above, New York courts explicitly have stated that TIAA–CREF plans are spendthrift trusts. *See Montgomery*, 104 B.R. at 117 n. 8 ("The substance of [*Alexandre*, 403 N.Y. S.2d 21, and *Matter of Aurora G.*, 414 N.Y.S.2d 632,] ... leads the Court to conclude that the New York courts considered the TIAA–CREF plans to be spendthrift trusts."). There can be no doubt: New York law puts Morter's pension benefits

well beyond the reach of Farm Credit Services or any other creditor.

To hold otherwise would defeat the legitimate expectations of Purdue University when it set up the plan and paid Morter's share of contributions. The district court held that, although both the TIAA and CREF annuity contracts satisfied the elements of an express trust, "only the CREF contract is so 'unequivocal in nature' as to [whether] the formation of a trust was the object of the parties' agreement." *Morter*, 110 B.R. at 395. We disagree. Purdue University could have fashioned a retirement plan any number of ways. Instead, the University set up a trust so that Morter would be provided for during his retirement and his dependents taken care of after his death. To that end, Morter was denied access to his funds until retirement. Even then, he does not have access to the entire accumulated contributions Purdue University made to TIAA; he receives only a stream of income paid on a monthly basis. One of the underlying policies of 11 U.S.C. § 541(c)(2) is to protect the legitimate expectations of the provider of the funds:

> Section 541(c)(2) ... strikes a delicate balance between enlarging the bankruptcy estate, while still honoring the spendthrift trust donor's wishes under state law. For it is the donor's desires which are protected through the concept of the spendthrift trust.... [T]his is underscored by the legislative history of § 541(c)(2) which notes that "[t]he bankruptcy of the beneficiary ... should not be permitted to defeat the *legitimate expectations of the settlor* of the trust."

*Swanson*, 873 F.2d at 1124 (citation omitted) (emphasis in original). The university's retirement fund was structured a certain way for a specific purpose. This purpose cannot be fulfilled if the plan can be raided in order to satisfy creditors.

For the above reasons, we conclude that both the TIAA and CREF components of Morter's retirement plan are excluded from the bankruptcy estate under 11 U.S.C. § 541(c)(2). Thus, we need not address Morter's argument that Indiana's recently amended exemption statute, Ind.Code § 34-2-28-1 (1990), prohibits levy or execution by judgment creditors on pension funds. That part of the district court's judgment including the TIAA portion of Morter's pension in the bankruptcy estate is hereby

REVERSED.