In the Matter of VACUUM CORP. f/k/a The Regina Company, Debtor.

WACHOVIA BANK OF GEORGIA, N.A., Plaintiff,

v.

VACUUM CORP., f/k/a The Regina Company and the United States of America, for and on behalf of the Internal Revenue Service, Defendants.

VACUUM CORP., f/k/a The Regina Company, Counterclaim Plaintiff,

v.

WACHOVIA BANK OF GEORGIA, N.A., Counterclaim Defendant.

VACUUM CORP, f/k/a The Regina Company, Cross–Claim Plaintiff,

v.

The UNITED STATES of America for and on Behalf of the INTERNAL REVENUE SERVICE, Cross–Claim Defendant.

Bankruptcy No. A95–63976–WHD. Adversary No. 95–6514A.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Nov. 26, 1997.

Karen Fagin White, Small, White & Marani, Atlanta, GA, for Wachovia Bank of Georgia, N.A.

Eric W. Anderson, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for Vacuum Corp., f/k/a the Regina Corp.

Sean O'Connor, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for I.R.S.

### *ORDER*

W. HOMER DRAKE, Jr., Bankruptcy Judge.

Currently before the Court in these proceedings is the Motion for Summary Judgment by Wachovia Bank, N.A., as successor by merger to Wachovia Bank of Georgia (hereinafter "the Bank"). This Motion arises from an action which the Bank has commenced against Vacuum Corp., f/k/a The Regina Company (hereinafter "the Debtor") and

the United States of America, for and on behalf of the Internal Revenue Service (hereinafter "the IRS"), seeking a declaratory judgment of its right to certain funds and an Order for turnover of the same. As a matter within the subject matter jurisdiction of the Court, see 28 U.S.C. § 157(b)(2)(A), (B), (E) & (O), the Bank's Motion shall be disposed of in accordance with the Findings of Fact and Conclusions of Law that follow.

### FINDINGS OF FACT

The facts attending this controversy are fairly straightforward. Prior to bankruptcy, the Debtor maintained an account with the Bank and, as part of that relationship, the parties agreed that the Debtor's payroll and taxes would be subject to automatic debit in amounts directed by Automatic Data Processing (hereinafter "ADP"). Specifically, acting as the Debtor's agent, ADP would submit computerized data to the Bank regarding the Debtor's impending payroll and withholding tax expenses, whereupon the Bank would debit the account in the appropriate amount and transfer such funds to ADP for subsequent disbursement.

Anticipating the Debtor's March 15, 1995 payroll needs, ADP made demand upon the Bank for $85,487.27, which amount represented withholding taxes that would be due for that payroll period. The Bank transferred the requested funds to ADP on the same day, notwithstanding the fact that the Debtor's account held a balance of only $1,183.89 at the time.

On the day following these transfers to its agent, the Debtor contacted ADP, directing that the March 15th payroll not be made. That decision to suspend payroll made unnecessary the withholding tax remittances, which by then had already been forwarded to the IRS, and a substantial refund consequently became due for the Debtor's overpayment of withholding taxes.

To whatever extent such a refund is due from the Internal Revenue Service,[1] the Bank has commenced the present adversary proceeding seeking a declaratory judgment of its right to any such funds and an Order for turnover of the same.[2] In support of this action, the Bank acknowledges that refunds upon a bankruptcy debtor's prepetition tax obligations normally would be considered property of the estate, and therefore, subject to pro rata distribution.[3] Given the unique circumstances under which this particular tax overpayment arose, however, the Bank contends that a constructive trust must be impressed, such that takes the Debtor's refund to the exclusion of other creditors.

### CONCLUSIONS OF LAW

### I. The Summary Judgment Standard.

In accordance with Federal Rule of Civil Procedure 56, this Court will grant summary

---

1. The IRS has in fact returned $34,879.32 of the transfer at issue to the Debtor. Of the remaining monies, it appears that the IRS applied $3,205.88 of the overpayment to taxes due for the first quarter of 1995, and $5,916.00 to taxes incurred by the Debtor after the petition date. From those same funds, the tax authority also satisfied a $13,285.60 late-filing penalty related to the first quarter 1995 return, and applied roughly $16,666.61 towards the Debtor's 1995 unemployment tax liability.

 Each of these uses to which the IRS has put the overpayment funds remains subject to Court scrutiny, as a dispute continues to linger on the extent of any additional refunds owing. (Opp. U.S. to Mot. S.J. at 2:3; Rep. Mem. Supp. Mot. S.J. at 2–3). To the extent that the present decision relates only to the Bank's entitlement to such funds, however, the consideration of these secondary issues relating to the precise amount that should be returned by the IRS need not be presently addressed by the Court, see infra note 19, and evaluation thereof shall instead be deferred for another ruling.

2. The Bank commenced this action against both the Debtor and the IRS, contending first that any appropriate refund should be disbursed by the tax authority, and second, that such refund should come to it rather than the estate. This action precipitated a counterclaim and cross-claim by the Debtor, wherein it demanded that the IRS turn over any overpayment due for refund.

3. See, e.g., In re Barowsky, 946 F.2d 1516 (10th Cir.1991) (portion of Chapter 7 debtors' federal income tax refunds attributable to prepetition portion of taxable year was property of their estate); In re Franklin Sav. Corp., 182 B.R. 859 (D.Kan.1995); In re Oliver, 172 B.R. 924 (Bankr. E.D.Mo.1994); In re McFarland, 170 B.R. 613 (Bankr.S.D.Ohio 1994); In re Martin, 167 B.R. 609 (Bankr.D.Or.1994); In re Larish, 149 B.R. 117 (Bankr.M.D.Tenn.1993); In re Lancaster, 161 B.R. 308 (Bankr.S.D.Fla.1993) (tax refunds generally constitute property of the bankruptcy estate).

judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (applicable in bankruptcy by virtue of FED.R.BANKR.P. 7056). A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the burden of establishing the right of summary judgment, *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982), and the Court will read the opposing party's pleadings liberally. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). The moving party must identify those evidentiary materials listed in Rule 56(c) which establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also* FED.R.CIV.P. 56(e). Once

the motion has been so supported by a prima facie showing of entitlement to judgment as a matter of law, the party opposing the motion must go beyond the pleadings and demonstrate that a material issue of fact exists to make summary judgment inappropriate. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir.1991).

## II. Overview of Code Section 541 as it Pertains to the Instant Case.

 Generally speaking, a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).[4] At the same time, however, the Code recognizes that the property of the bankruptcy estate should not include any interest in which the debtor holds only bare legal title, to wit:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2314 n. 10, 76 L.Ed.2d 515 (1983) (noting in dicta that "Congress plainly

---

**4.** Funds normally are said to qualify as "property of the estate" within the meaning of Code section 541 when the debtor exercises sufficient dominion and control thereover. *See Mather v. I.F. Pipe Co.*, 982 F.2d 529 (10th Cir.1992) ("[i]t is the debtor's control of the funds, or lack thereof, which is central to the determination"); *see also In re Joliet–Will County Community Action Agency*, 847 F.2d 430 (7th Cir.1988) (federal and state grants were made to organization as trustee, custodian, or other intermediary, who lacked beneficial title and was merely agent for dispersal of funds belonging to another, and thus, funds, and personal property bought with it, did not constitute "assets of bankruptcy estate," where grants imposed specific limitations upon the use of such funds); *In re Sacred Heart Hosp. of Norristown*, 175 B.R. 543 (Bankr.E.D.Pa.1994) (checks made payable to debtor-hospital did not cease to become property of hospital's bankruptcy estate simply because they had been deposited in bank account established by hospital to facili-

tate payment of its debt to third parties; although third parties were only parties to exercise control over funds in account, the hospital had right of control and had asserted claim to any funds not necessary for payment of third parties' fees). As one commentator has explained:

> If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate. In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law whether or not she actually owns it.

I DAVID G. EPSTEIN, ET AL., BANKRUPTCY § 6–7, at 522 (1992) (quotation omitted). Thus, as a baseline premise, the funds here at issue must be considered eligible for treatment as "property of the estate," to the extent that they were released to ADP, as the Debtor's agent, and could have been used for the payment of creditors generally.

excluded property of others held by the debtor in trust at the time of the filing of the petition"). Thus, it has become well-settled in bankruptcy practice that debtors do not own an equitable interest in property held in trust for another,[5] and consequently, such funds do not amount to "property of the estate" for bankruptcy purposes. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir.1994); *Matter of Al Copeland Enterprises, Inc.*, 991 F.2d 233 (5th Cir.1993); *In re Johnson*, 960 F.2d 396 (4th Cir.1992). The burden of proving such a relationship falls upon that party seeking to exclude a given asset from the estate as having been held by debtor in trust. *In re Mark Benskin & Co., Inc.*, 161 B.R. 644 (Bankr.W.D.Tenn. 1993); *In re San Diego Realty Exchange, Inc.*, 132 B.R. 424 (Bankr.S.D.Cal.1991); *In re Dobbs*, 115 B.R. 258 (Bankr.D.Idaho 1990); *In re Hillcrest Foods, Inc.*, 31 B.R. 563 (Bankr.D.Me.1983).

 Be it expressed between the parties[6] or implied from the circumstances,[7] the existence of a trust relationship turns on applicable nonbankruptcy law. *See Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136(1979); *see also Morter v. Farm Credit Servs.*, 937 F.2d 354 (7th Cir. 1991), *cert. denied* 505 U.S. 1204, 112 S.Ct. 2991, 120 L.Ed.2d 868; *In re Denton*, 169 B.R. 612 (W.D.Tex.1994); *Jacobs v. Shields*, 116 B.R. 134 (D.Minn.1990). Since, however, the generation of constructive trust substantially offends the Bankruptcy Code's general goal of equal distribution,[8] courts generally

---

5. For example, in *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372 (11th Cir. 1989), the Court of Appeals for this Circuit held that certain funds were not part of a subcontractor's bankruptcy estate because the general contractor had paid those monies into a joint bank account for the sole purpose of paying the subcontractor's materialmen. *Id.* at 1376. The general contractor and the subcontractor previously had entered into a contract requiring the general contractor to create and control a bank account in the subcontractor's name for the sole purpose of paying the subcontractor's suppliers. When the subcontractor thereafter filed for bankruptcy, leading the general contractor, Trust Company Bank (the subcontractor's lender), and the bankruptcy trustee each to claim an interest in the money, the court held that the subcontractor held these funds in trust for its materialmen and therefore, those funds were not part of the bankruptcy estate. *Id.* at 1376.

6. Regarding the creation of express trusts, Georgia law provides:
 (a) An express trust shall be created or declared in writing.
 (b) An express trust shall have each of the following elements, ascertainable with reasonable certainty:
 (1) An intention by a settlor to create a trust;
 (2) Trust property;
 (3) A beneficiary;
 (4) A trustee; and
 (5) Active duties imposed on the trustee, which duties may be specified in the writing or implied by law.
 See O.C.G.A. § 53–12–20. Since all express trusts must be created or declared in writing, an express trust may not be impressed by parol evidence upon a deed. *See Fowler v. Montgomery*, 254 Ga. 118, 326 S.E.2d 765 (1985); *see also Gooden v. Buffalo Sav. Bank*, 21 B.R. 456 (Bankr.

N.D.Ga.1982) (a constructive trust may only be an implied trust, since all express trusts must be in writing under Georgia law).

7. State law normally will provide all guidance on the existence of an implied trust. For instance, the 1991 Georgia Trust Act defines an "implied trust" as "a trust in which the settlor's intention to create the trust is implied from the circumstances, and which meets the requirements of Code Sections 53–12–90 through 53–12–93." *See* O.C.G.A. § 53–12–2. Georgia Code section 53–12–90, clarifies that such an implied trust may take either a resulting or a constructive form. *See* O.C.G.A. § 53–12–90. Under the terms of Georgia law, a resulting trust can arise under any of three circumstances: (1) when an express trust is created but fails for any reason; (2) when a trust is fully performed without exhausting all of the trust property; and (3) when a purchase money resulting trust is established. *See* O.C.G.A. § 53–12–91. The second kind of implied trust, i.e., a constructive trust, arises "whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." *See* O.C.G.A. § 53–12–93. In cases involving implied trusts, the court may hear parol evidence on the nature of the transaction, the circumstances, and the parties' conduct. O.C.G.A. § 53–12–94.

8. As one court succinctly has explained:
 The reluctance of Bankruptcy Courts to impose constructive trusts without a substantial reason to do so stems from the recognition that each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly.

will require that nonbankruptcy grounds for imposing a constructive trust "be so clear, convincing, strong and unequivocal as to lead to but one conclusion." *See Amendola v. Bayer,* 907 F.2d 760, 763 (7th Cir.1990)(internal quotation omitted); *see also Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)* 206 B.R. 394, 400 (suggesting that "a constructive trust is not inherently incompatible with the fair treatment of creditors in bankruptcy," but noting that such a trust "should not be impressed cavalierly"). Ultimately, it falls within the discretion of the bankruptcy court to imply a constructive trust from the circumstances, *see American Metal Forming Corp. v. Pittman,* 52 F.3d 504, 508 (4th Cir. 1995), and such trusts generally shall not be impressed in contravention of bankruptcy policy. *See Butner,* 440 U.S. at 55, 99 S.Ct. at 918 (property interests in a bankruptcy proceeding may not be determined by state law when federal law would require a different result); *McCafferty v. McCafferty (In re McCafferty),* 96 F.3d 192, 196 (6th Cir.1996) ("[w]hen such a conflict occurs, bankruptcy policy prevails"); *Taylor Assocs. v. Diamant (In re Advent Management Corp.),* 178 B.R. 480, 489 (9th Cir. BAP 1995) ("it does not end the matter for a court to find that state law would impose a constructive trust over certain property; the constructive trust will not be given effect if it is against the federal bankruptcy policy").

*In re Behring International, Inc.,* 61 B.R. 896, 902 (Bankr.N.D.Tex.1986). Indeed, largely for such policy reasons, the fundamental viability of constructive trusts claims in bankruptcy recently has come under significant attack, both in case law and in legal commentary. *See, e.g., XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443 (6th Cir.1994); *Cooper v. First Citizens Bank (In re Jones),* 186 B.R. 71, 78 (Bankr.W.D.Ky.1995); *Berger, Shapiro & Davis, P.A. v. Haeling (In re Foos),* 183 B.R. 149, 154 (Bankr.N.D.Ill.1995); *Monfort, Inc. v. Kunkel (In re Morken),* 182 B.R. 1007, 1022–23 (Bankr. D.Minn.1995); *see also* Carlos J. Cuevas, *Bankruptcy Code Section 544(d) and Constructive Trusts,* 21 Seton Hall L. Rev. 678, 687 (1991).

**9.** Federal statute expressly designates taxes withheld by an employer as generating a trust for the benefit of the United States:

Whenever any person is required to collect or withhold any internal revenue tax from any

## A. The Supreme Court's Begier Holding as a Basis for an Implied Trust.

■ As its first basis for contending that an implied trust exists to exclude the funds in question from the debtor's bankruptcy estate, the Bank relies upon their connection to withholding taxes,[9] and the Supreme Court's assignment of a trust character to such payments in *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In that case, the Court addressed the viability of a trustee's action to recover, as a preferential transfer, certain prepetition excise tax payments [10] which the Debtor tendered to the IRS prepetition. Noting that a statutory trust under 26 U.S.C. § 7501 arose at the moment that taxes enumerated therein became withheld or collected, the Court held that the acts of "collecting" and "withholding" occur at the time of payment—the recipient's payment in the case of excise taxes and the employer's payment of wages in the case of FICA and income taxes. *Id.* at 61, 110 S.Ct. at 2264. As such, the Supreme Court held that debtor's payments of withheld federal income and FICA taxes and excise taxes were not transfers of "property of the debtor," but instead were transfers of property held in trust, which transfers could not be avoided under a preference theory. *Id.* at 67, 110 S.Ct. at 2267.

According to the Bank, this line of reasoning from *Begier* should control the instant

other person and to pay over such tax to the United States, the amount of the tax so collected or withheld shall be held to be a special fund in trust for the United States.
26 U.S.C. § 7501.

**10.** The Internal Revenue Code directs "every person receiving any payment for facilities or services" subject to excise taxes to "collect the amount of the tax from the person making such payment." 26 U.S.C. § 4291. Similarly, the Tax Code also requires an employer to "collect" Federal Insurance Contributions Act (FICA) taxes from its employees "by deducting the amount of the tax from the wages as and when paid," 26 U.S.C. § 3102(a), and to "deduct and withhold upon such wages [the employee's federal income tax]," 26 U.S.C. § 3402(a)(1). Since the amount of taxes "collected or withheld" under these various provisions is said to be "held to be in a special fund in trust for the United States," 26 U.S.C. § 7501, such taxes often are referred to as "trust-fund taxes."

controversy.[11] Specifically, the Bank reasons, since the payments at issue related to the "collection" of trust-fund taxes, *Begier* dictates that such funds not be considered property of the estate. Rather, as in the *Begier* holding, the Bank contends that a trust must be found to exist over the tax payments, and to the extent that any overpayment has been produced thereby, the associated refund likewise must be impressed with an impliedly exclusionary trust.

Appealing as it may seem, this reasoning will not sustain close examination. As the Supreme Court's holding instructs, a *Begier* trust arises at the time that a tax is "collect-

ed," an event which occurs in the withholding tax context when wages are paid. *Id.* at 61, 110 S.Ct. at 2264. Here, however, because the Debtor canceled its scheduled payroll, no wages ever were disbursed to employees, meaning that no taxes ever were "collected" under the direct terms of the *Begier* holding.[12] For this reason, when applied to the facts of this case, the specific terms of the Supreme Court's *Begier* decision unequivocally reveal that no trust ever arose by virtue of the withholding tax character of finds here at issue.[13] As such, the Bank may not rely upon the doctrine of *Begier* to exclude the overpayment here at issue from the Debtor's bankruptcy estate.[14]

---

11. According to the *Begier* majority, section 547's undefined reference to "property of the debtor" is best understood to mean property that would have been part of the estate had it not been transferred. *Begier*, 496 U.S. at 58–59, 110 S.Ct. at 2262–63. This definition, the Court reasoned, must be read coextensively with its postpetition analog, "property of the estate," which includes all of the debtor's legal or equitable interests in property as of the commencement of the case. *See id.* at 59, 110 S.Ct. at 2263; *see also* 11 U.S.C. § 541(a)(1). As such, while that decision arose in the context of preference litigation, the Bank correctly notes that it must be understood to govern applications of Bankruptcy Code section 541 as well.

12. Indeed, given the direct link between wage payment and a trust's creation under the *Begier* rationale, it would seem that a *Begier* trust only may be said to arise over remittances upon valid and assessable withholding taxes, i.e., only when wages have been paid such that a duty of withholding collection arises. As the *Begier* Court noted in the course of answering the question then before it,

> The same analysis applies to taxes the Internal Revenue Code requires that employers "withhold." Section 3402(a)(1) requires that "every employer making payment of wages shall deduct and withhold *upon such wages* [the employee's federal income tax]." Withholding thus occurs at the time of payment to the employee-of his net wages. S.Rep. No. 95–1106, p. 33 (1978) ("[A]ssume that a debtor owes an employee $100 for salary on which there is required withholding of $20. If the debtor paid the employee $80, there has been $20 withheld. If, instead, the debtor paid the employee $85, there has been withholding of $15 (which is not property of the debtor's estate in bankruptcy)"). *See Slodov [v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978)] (stating that "[t]here is no general requirement that the withheld sums be segregated from the employer's general funds," and thereby necessarily implying that

the sums are "withheld" whether or not segregated). The common meaning of "withholding" supports our interpretation. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1981) (defining "withholding" to mean "the act or procedure of deducting a tax payment from income *at the source* ").

13. Specifically, until such time as wages actually have been by paid, no trust arises under the *Begier* rationale. *Id.* at 61, 110 S.Ct. at 2264 ("[w]e conclude, therefore, that [the Debtor] created a trust within the meaning of section 7501 at the moment the relevant payments ... to its employees ... were made").

14. Even if a tax were to have been "collected" in the instant case, such that a *Begier* trust might be impressed upon the funds associated therewith, that trust would exist for the benefit of the IRS, rather than for benefit of the Bank. *See, e.g., Begier*, 496 U.S. at 64, 110 S.Ct. at 2265–66 (quoting 124 Cong. Rec., at 32363 ("[u]nder [section 7501], the amounts of withheld taxes are held to be a special fund in trust for the United States.")(remarks of Rep. Edwards)); *see also Begier*, 496 U.S. at 66, 110 S.Ct. at 2266–67 (quoting H.R.Rep. No. 95–595 at 373, *reprinted in*, U.S.C.C.A.N 1978, p. 6329) (remarks of Rep. Edwards) ("the beneficiary of the trust, the taxing authority, is in a separate class with respect to those taxes"). To whatever extent the bank might enjoy the benefits of that trust, therefore, it would do so in a solely derivative fashion. *Cf. Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1157–58 (2d Cir.1994) (claimant sufficiently established her own status as beneficiary, so as to have standing to seek imposition of constructive trust). As such, where as here, the IRS appears to have waived its rights as beneficiary by returning overpayments to the Debtor, no trust should continue in existence to exclude such funds from the bankruptcy estate. *See Taylor Assocs. v. Diamant*, 178 B.R. 480, 489 (9th Cir. BAP 1995) (noting that a third party's benefitting from a constructive trust predicates itself upon a

*Begier*, 496 U.S. at 60–61, 110 S.Ct. at 2263–64 (emphasis in original).

### B. Payment Demand by a Non–Depositor as Basis for an Implied Trust.

■ As an alternate basis for finding the monies in question to be excluded from the Debtor's estate, the Bank alleges that, when it disbursed funds to ADP for subsequent payment to the IRS, it did so from its own funds rather than from the debtor's account. Particularly, the Bank relies upon *Williams v. American Surety Co. of New York*, 83 Ga.App. 66, 62 S.E.2d 673 (1950), wherein the Georgia Court of Appeals held that a bank which pays funds "on any other order [than that of its depositor] it pays its own funds and ... is entitled to recover such payment in an action for money had and received." *Id.* 62 S.E.2d at 676. Thus, the Bank would appear to reason, since it transferred the funds at issue on the order of a party other than the debtor, it did so from its own assets, and the associated refund consequently must be viewed as excluded from the Debtor's estate.

Setting aside all inquiry of the rights to which a lender might be entitled under *Wright* and its progeny,[15] this analysis misconstrues the circumstances under which a bank pays "on any other order" than that of the depositor. As the *Wright* opinion reveals in a discussion immediately following the passage cited by the Bank,

> As we view the record in this case the sole question for the court, sitting as judge and jury to decide ... was whether or not the defendant, when he drew the checks on the account of [the depositor] had actual authority to do so. The bank had no authority to pay funds out of [the depositor's] account except upon the order of some person duly authorized by Coleman to draw thereon, and the fact that the defendant may have been a creditor of [the depositor] does not change this rule.

*Id.* at 70, 62 S.E.2d 673. Stated otherwise, the remedies contemplated by *Wright* do not arise unless the Bank has paid on the demand of someone other than the Debtor, *or its authorized agent. Id.*

Here, the Bank transferred funds from the Debtor's account to ADP, on the latter party's demand. While not specifically addressed by either party, it appears subject to concession that ADP made this demand for a transfer from the Debtor's account with actual authority to issue such directives.[16] For this reason, the Bank effectively disbursed funds on the demand of the depositor as that concept is defined by the *Wright* decision, and the unauthorized distribution remedies therein provided, consequently, lie outside the Bank's grasp.

### C. Mistake a Basis for an Implied Trust.

■ As a final ground upon which to exclude the tax overpayment from the Debtor's estate, the Bank notes a principle of Georgia law, whereunder money paid under a mistake

---

successful assertion of that trust relationship by the beneficiary, and particularly, the beneficiary's not having waived or compromised its rights).

bank "is entitled to recover such payment in an action for money had and received"). It should not, in the Court's eyes, be read to provide a remedy beyond that cause of action.

**15.** The Court does note its own reservations upon the applicability of *Wright* to the type of depositor-bank disputes involved in the present case. Rather than establishing ownership to transferred funds as between the bank and its account holder, *Wright* merely seems to hold that a bank "pays its own funds," to the extent that it has a claim for reimbursement vis-a-vis the transferee of an unauthorized payment from the depositor's account. As such, recognizing that a bank cannot charge the depositor upon satisfying an unauthorized demand upon its account, this line of case law vests the bank with a claim against the party who wrongly obtained payment. *See id.* at 70, 110 S.Ct. at 2268–69 (the

**16.** Pursuant to agreement, the Bank transferred funds to cover the Debtor's payroll and tax expenses, based upon computerized data generated and submitted by ADP, in its capacity as the Debtor's agent. (Smith Aff., ¶¶ 4, 5). While ADP's actual authority to make demand upon the bank for the March 15, 1995 payroll expenses ultimately was curtailed by an order that payroll not be distributed, such qualification did not come until March 16, 1995, when the bank transfer already had been completed. (Bank's Stmt. Mat. Facts, ¶ 5; Smith Aff., ¶ 8). Thus, at both the time of demand and the point of transfer, ADP must be viewed having held actual authority to oversee these aspects of the Debtor's business.

of fact or ignorance "may be recovered, if the circumstances are such that the party receiving it ought not, in equity and good conscience, to retain it." *See Roach v. Roach,* 68 Ga.App. 10, 21 S.E.2d 859 (1942) (citing *Atlanta Telephone & Telegraph Co. v. Fain,* 16 Ga.App. 475, 85 S.E. 791 (1915)). In particular, the Bank asserts that it capitulated to ADP's demand for payment, notwithstanding there being insufficient funds in the Debtor's account, under a mistaken belief that withholding taxes were due and owing to the IRS at that time. To the extent that such an assumption later proved inaccurate, the Bank consequently submits that a constructive trust must be impressed upon those funds for its benefit.

█ In advancing this line of contention, however, the Bank overlooks a key requirement of the involved doctrine, specifically, Georgia law's implicit requirement that any such mistake of fact has been relied upon to the creditor's detriment. *See, Time Ins. Co. v. Fulton–DeKalb Hosp. Auth.,* 211 Ga.App. 34, 438 S.E.2d 149 (1993) (noting that the payor must act "under a mistake of fact"); *see also Citizens' Bank of Fitzgerald v. Rudisill,* 4 Ga.App. 37, 60 S.E. 818 (1908) (to authorize a recovery on the theory that plaintiff has paid defendant money under a mistake of fact, plaintiff must show that he was "laboring under a mistake as to the facts," and not merely that he was ignorant of the means of proving the facts which would show his nonliability). At a minimum, this component of the implicated doctrine should require the Bank to show that the tax-related quality of the underlying transfer significantly precipitated its decision to pay an overdraft upon the Debtor's account.

█ In the instant case, however, no evidence suggests that the Bank would not have paid the overdraft had it not been designated for withholding taxes, or had the payment appeared possibly subject to refund.[17] Indeed, to the contrary, reason and standard business practice suggest that the Bank completed the transfer, not in reliance upon the fund's intended use and destination, but instead upon the character of its relationship with the Debtor, and particularly, a belief that an overdraft in the account ultimately would be made good.[18] The Bank having presented no evidence otherwise suggesting an element of reliance by it upon the specific nature of the involved payment, this third and final basis for a constructive trust's imposition, too, must fail.[19]

---

17. For much the same reason, to whatever extent the earmarking doctrine of preference analysis might be said to apply to determinations of the estate's interest in property, it could not be satisfied under these circumstances. As summarized by one court,

> Under the earmarking doctrine, when a third party advances or loans funds to the debtor with instructions to use the funds to pay off another creditor, the funds are said to be earmarked for payment to a specific creditor or creditors and do not become property of the debtor. *E.g., In re Van Huffel Tube Corp.,* 74 B.R. 579, 585 (Bankr.N.D.Ohio 1987).

*In re Sierra Steel, Inc.,* 96 B.R. 271, 274 (9th Cir. BAP 1989). While perhaps subject to extension beyond the context of preference avoidance, *see supra* note 8, this analysis fails to advance the Bank's present interest, as nothing indicates that payment of the overdraft here at issue was conditioned upon the fund's being used to pay off a valid, outstanding indebtedness for withholding taxes. *Cf. McLemore v. Third Nat'l Bank in Nashville,* 983 F.2d 1389, 1395 (6th Cir.1993) (earmarking applies when the lender effectively designates an existing creditor as payee from the transferred funds).

18. In this respect, the Court notes without deciding that the Bank may not succeed under a theory of mistake, even if it subsequently produces evidence that transfer hinged partly upon the existence of an outstanding tax obligation from upcoming payroll disbursements. To the extent that the Bank found itself faced with an overdraft transfer and nonetheless authorized the same, it appears to have made a calculated gamble that such funds subsequently would be repaid. In view of its having taken that risk, equity well may demand that the Bank not be heard to complain about any resulting loss from not being subsequently repaid. *Cf. Mitchell v. Liberty Nat'l Life Ins. Co.,* 70 Ga.App. 737, 29 S.E.2d 425 (1944) (even where money is paid under a mistake or ignorance of facts, it cannot be recovered, unless the circumstances are such that the party receiving it ought not in equity and good conscience to retain it); *Roach,* 68 Ga.App. at 10, 21 S.E.2d 859 (remedy for mistaken payment is equitable in nature).

19. The Debtor correctly notes that exclusion of estate assets under a constructive trust theory requires the purported claimant-beneficiary to assume a two-fold burden. Specifically, the claimant must first establish a legal foundation

CONCLUSION

None of the three separate bases advanced for the impression of a constructive trust in this proceeding appear to warrant that form of relief. As such, it hereby is **ORDERED** that the Motion for Summary Judgment of Wachovia Bank, N.A., as successor by merg-

upon which a trust may be impressed, and thereafter, he or she must identify or "trace" the assets allegedly subject to a trust's imposition. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (1994); *Megafoods Stores, Inc. v. Texas Comptroller of Public Accts. (In re Megafoods Stores, Inc.)*, 210 B.R. 351, 353 (9th Cir. BAP

er to Wachovia Bank of Georgia, is **DENIED.**

**IT IS SO ORDERED.**

1997). The Bank having failed, however, to present any cognizable basis for a trust's constructively being generated, the Court shall dispose of its Motion for Summary Judgment without addressing the secondary tracing element in this process.